Paul SCHMIDT, et al., Plaintiffs,

v.

FLEET BANK, et al., Defendants.

Gary S. FRAGIN, Plaintiff,

v.

FLEET BANK and Leonard Patnoi, Defendants.

Jacob and Chana ZELIGFELD, et al., Plaintiffs,

v.

FLEET BANK and Leonard Patnoi, Defendants.

Norman FEINSTEIN, Plaintiff,

v.

FLEET BANK, et al., Defendants.

Nos. 96 Civ. 5030(AGS) (Action 1), 96 Civ. 7836(AGS) (Action 2), 97 Civ. 9298(AGS) (Action 3) and 98 Civ. 2901(AGS) (Action 4).

United States District Court, S.D. New York.

Aug. 6, 1998.

---

Robert J. Jossen, Kevin J. O'Brien, Daniel L. Abrams, Shereff, Friedman, Hoffman & Goodman, New York City, for Plaintiffs Paul Schmidt and Gary S. Fragin (Action 1 and 2).

Israel Weinstock, Jeffrey M. Schwartz, Weinstock, Joseph, Klatsky, Nisonoff & Schwartz, LLP., Belle Harbor, NY, for Jacob and Chana Zeligfeld (Action 3).

Brian E. Maas, Beldock Levine & Hoffman LLP, New York City, for Norman Feinstein (Action 4).

Allen C. Wasserman, India DeCarmine, Lauren P. Gaynor, Owen & Davis P.C., New York City, for Sterling Nat. Bank & Trust Co. of New York (Actions 1 and 2).

Richard F. Ziegler, Thomas J. Moloney, David M. Meisels, Amy J. Wolosoff, John R. Garry, Joon H. Kim, Cleary, Gottlieb, Steen & Hamilton, New York City, for Fleet Bank (Actions 1, 2, 3 and 4).

Robert A. Culp, Law Offices of Laura A. Brevetti, New York City, for Patnoi (Actions 1, 2, 3 and 4).

## OPINION AND ORDER

SCHWARTZ, District Judge.

Six related cases have been filed by investors defrauded by David Schick. By Opinion and Order dated February 4, 1998 ("the February 4 Opinion"), familiarity with which is assumed, the Court granted the motions of several defendants to dismiss the complaints in four cases, *Schmidt v. Fleet Bank, et al.*, 96 Civ. 5030, 1998 WL 47827 (S.D.N.Y.1998), *Fragin v. Fleet Bank and Leonard Patnoi*, 97 Civ. 7836, 1998 WL 47827 (S.D.N.Y.1998), *Eshell v. Fleet, et al.*, 96 Civ. 9705, 1998 WL 47827 (S.D.N.Y.1998) and *Bassman v. Blackstone Assoc., et al.*, 96 Civ. 9706, 1998 WL 47827 (S.D.N.Y.). In the wake of the February 4 Opinion, there were several procedural developments. First, the plaintiffs in *Eshell* and *Bassman* informed the Court by letter dated March 9, 1998 that they had determined to abandon their federal claims against the dismissed parties and to pursue their remedies against these parties in state court. Accordingly, the *Eshell* and *Bassman* actions are dismissed with respect to defendants Republic National Bank ("Republic"), Sterling National Bank & Trust Company ("Sterling"), Fleet Bank ("Fleet") and Citibank, N.A. and Neil Simon ("Simon"). Second, the plaintiffs in *Schmidt* and *Fragin* requested permission to file amended complaints curing the deficiencies in the original complaints. By stipulation dated March 20, 1998, the parties agreed that the plaintiffs in these two actions would be permitted to file amended complaints, which were filed on April 22, 1998. Finally, the plaintiffs in two new related actions, *Feinstein v. Fleet Bank et al.*, 98 Civ. 2901 and *Zeligfeld v. Fleet Bank and Patnoi*, 97 Civ. 9298, also filed complaints on April 23, 1998 and April 28, 1998 respectively. Fleet and Leonard Patnoi ("Patnoi") (collectively the "Fleet Defendants") have moved to dismiss the complaints in all the captioned matters. Sterling has moved to dismiss the complaints in *Schmidt* and *Feinstein*. For the reasons stated, the motions of Fleet and Patnoi are granted and Sterling's motions will be held in abeyance.

## FACTUAL BACKGROUND

### I. Schick's Scheme

These cases arise out of a scheme orchestrated by David Schick. In connection with

this scheme, Schick pled guilty to fraud in the Southern District of New York and Eastern District of New York. According to plaintiffs, Schick, through various entities that he controlled, including Venture Mortgage Fund, L.P. and Venture Mortgage Corp. (collectively "Venture") and Blackstone Associates ("Blackstone"), would bid on distressed mortgage pools at auctions and sales conducted by the Resolution Trust Company ("RTC"), the Federal Deposit Insurance Corporation ("FDIC"), and other banking institutions. (*Zeligfeld* Am. Compl. ¶ 35; *Feinstein* Compl. ¶ 14.) Schick told investors that, after being awarded a bid to purchase a mortgage pool, subject to at least a 90–day due-diligence period, he could resell the same pool to a "take-out buyer" for a substantial profit (usually between 12% and 20%), subject to a due diligence period of fewer than 90 days. (*Schmidt* Am. Compl. ¶¶ 29–30; *Zeligfeld* Am. Compl. ¶ 36; *Feinstein* Compl. ¶¶ 14–15.) According to Schick, if the take-out buyer declined to purchase the pool, he could rescind the original purchase within his own 90–day due-diligence window, at no cost to him or his investors. (*Zeligfeld* Am. Compl. ¶ 36; *Feinstein* Compl. ¶ 14.) Schick told investors that in order to be able to close on a bid, he needed to deposit substantial sums of cash—ten percent of the bid—to evidence to the auctioneer (usually the FDIC or RTC) his ability to complete the purchases. (*Zeligfeld* Am. Compl. ¶ 38; *Fragin* Second Am. Compl. ¶¶ 40–41; *Feinstein* Compl. ¶ 14.) To collect this "earnest money," Schick solicited funds from investors and assured them that their investments would be protected in escrow accounts covered by restrictive provisions, including a requirement that no funds could be withdrawn without the signature of the plaintiffs' representative. (*Fragin* Second Am. Compl. ¶¶ 16, 56–57, 73; *Feinstein* Compl. ¶¶ 18, 19, 42.)

Plaintiffs allege that on the basis of these fraudulent promises, Schick induced more than 50 victims to invest over $100 million, approximately $82 million of which was eventually stolen by him. (*Fragin* Second Am. Compl. ¶ 18, 117–121; *Schmidt* Am. Compl. ¶ 31.)

## II. Fleet's Role

Most of plaintiffs' funds were maintained at Fleet's Hewlett, New York branch,[1] where Patnoi, a Fleet Vice–President, was Branch Manager. Plaintiffs allege that Fleet aided Schick in stealing their money by:

(i) approving withdrawals and transactions that violated the restrictive provisions on the accounts (*Schmidt* Am. Compl. ¶¶ 43, 46; *Fragin* Second Am. Compl. ¶¶ 32–33, 80–81, 102(b); *Zeligfeld* Am. Compl. ¶¶ 67, 97; *Feinstein* Compl. ¶ 45 );

(ii) repeatedly approving overdrafts on the accounts (*Schmidt* Am. Compl. ¶¶ 44, 54; *Fragin* Second Am. Compl. ¶¶ 28–33, 85, 88–89, 102(d); *Zeligfeld* Am. Compl. ¶ 57, 62, 102, 104, 107; *Feinstein* Compl. ¶¶ 44–45);

(iii) failing to inform either the state banking authorities or the investors of what it knew regarding the fraud in violation of clear legal obligations to do so (*Schmidt* Am. Compl. ¶¶ 49, 55; *Fragin* Second Am. Compl. ¶ 91–93, 96, 102(e); *Zeligfeld* Am. Compl. ¶¶ 61, 72, 88, 89, 103, 105, 107; *Feinstein* Compl. ¶¶ 46–47) and

(iv) misleading investors as to the status of the accounts (*Fragin* Second Am. Compl. ¶ 84, 102(c); *Zeligfeld* Am. Compl. ¶ 99; *Feinstein* Compl. ¶¶ 31–33, 51), by, among other things, submitting to investors a fraudulent report on February 28, 1996 overstating

---

1. Most of the *Schmidt* plaintiffs' funds were maintained at Fleet's branch office in Hewlett, New York in "Account 1987," opened as an Attorney Trust account by Frenkel & Hershkowitz, a law firm in which Schick was then a partner, (*Schmidt* Am. Compl. ¶¶ 24, 36 ) on April 29, 1994. The *Schmidt* plaintiffs' funds were also maintained in Sterling Account 5801, opened as a Frenkel & Hershkowitz escrow account at a Sterling branch office in New York, New York in December 1994, and in Republic Account 3029, opened as an escrow account in the name of Schick & Simon, a law firm in which Schick was also a partner. (*Schmidt* Am. Compl. ¶¶ 58–59.) *Fragin's* funds were deposited in Fleet Trust Account 156. (*Fragin* Second Am. Compl. ¶¶ 46–71.) *Feinstein's* funds were maintained in Fleet Account 1987. (Feinstein Compl. ¶¶ 26, 30.) The *Zeligfeld* plaintiffs' funds were held in various Fleet escrow accounts, including Special Account 771 890103. (*Zeligfeld* Am. Compl. ¶ 134.)

the balance of the escrow account in which most of the investors' funds were maintained and misrepresenting that the account restrictions were still in place. (*Schmidt* Am. Compl. ¶ 53; *Zeligfeld* Am. Compl. ¶¶ 73–76, 100–101; *Feinstein* Compl. ¶ 37.)

Plaintiffs have alleged two motives for Fleet's assistance to Schick. First, plaintiffs allege that Schick paid Patnoi an amount between $100,000 and $125,000 and arranged for the discharge of two loans totalling $30,-000 on Patnoi's behalf. (*Fragin* Second Am. Compl. ¶ 108; *Zeligfeld* Am. Compl. ¶¶ 50, 53, 70, 108; *Feinstein* Compl. ¶ 53.)[2] Second, plaintiffs allege that Schick's attorney escrow deposits constituted the overwhelming bulk (80% to 90%) of the deposits received by the Hewlett branch during the period 1994 to 1996, and that Fleet officers assisted Schick in his scheme because of the close relationship he had developed with Fleet as its largest customer and the benefits derived by Fleet through such large deposits. (*Schmidt* Am. Compl. ¶ 41; *Fragin* Second Am. Compl. ¶¶ 23–24, 28, 103–107; *Zeligfeld* Am. Compl. ¶¶ 52, 71, 91–94, 109, 110; *Feinstein* Compl. ¶ 52.) Plaintiffs also allege that Schick developed a close relationship with Jane Manditch, Patnoi's superior at the Hewlett branch. (*Schmidt* Am. Compl. ¶ 42.)[3]

On the basis of these allegations, plaintiffs have made claims against the Fleet Defendants for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and conspiring to violate RICO, 18 U.S.C. § 1962(d) and against Fleet, Patnoi and Sterling for various causes of action under New York state law.

## DISCUSSION

### I. Standards on a Motion to Dismiss

"[A] complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On a motion to dismiss, the allegations in the complaint are liberally construed and considered in the light most favorable to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, the court is not required to accept as true "conclusions of law or unwarranted deductions." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (citations omitted).

### II. Plaintiffs' Alleged Wrongdoing

As an initial matter, the Court rejects Fleet's argument that plaintiffs' participation with Schick in a scheme to defraud the Government mandates dismissal of their suits. (Fleet Memorandum of Law in Support of its Motion to Dismiss ("Fleet Mem.") at 8–11.) 18 U.S.C. § 1007 makes it a crime to knowingly assist a plan to defraud the FDIC. However, nothing in the record before the Court indicates that the plaintiffs were knowing participants in a scheme to defraud the Government or that Schick was prosecuted for that fraudulent scheme. In addition, the defense of *in pari delicto* is, generally, only available in actions among wrongdoers themselves. It cannot be invoked by a bank which is the depository of funds in an illegal transaction, but not itself a party to the transaction. *Southwestern Shipping Corp. v. National City Bank,* 6 N.Y.2d 454, 190 N.Y.S.2d 352, 356, 160 N.E.2d 836 (1959) ("A mere agent or depository of the proceeds of an illegal transaction will not be permitted to assert the defense of illegality in an action to recover the proceeds by a party to the illegal

---

**2.** It is undisputed that Patnoi was discharged by Fleet in February 1996 because of his role in Schick's scheme.

**3.** The complaints do not make clear plaintiffs' theory as to how Schick managed to gain access to escrow accounts maintained at banks other than Fleet. The *Schmidt* Amended RICO Statement states "Although plaintiffs have reason to believe that [the Republic and Sterling] accounts, like the Fleet Account, ultimately were looted by

Schick with the possible substantial assistance of employees of Sterling and Republic, plaintiffs currently do not have specific evidence of such involvement ...." (*Schmidt* Am. RICO Statement at 5.) The *Schmidt* Amended Complaint alleges that Schick looted the Republic and Sterling accounts by forging the name of a required signatory on withdrawal requests. (*Schmidt* Am. Compl. ¶ 61.)

transaction.") The cases relied on by Fleet involve situations in which the plaintiff sought to enforce an illegal contract against its partner in crime. The captioned cases do not present such a situation.

## III. RICO

■ In considering RICO claims, courts must attempt to achieve results "consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime." *United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir.1989). As one district court within this circuit has stated "Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y.1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991)), *aff'd.*, 113 F.3d 1229. "Because the 'mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).) To this end, a court's focus must be "to ensure that RICO's severe penalties are limited to 'enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering.'" *United States v. Davidson*, 122 F.3d 531, 534 (8th Cir.1997) (quoting *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.1982)), *cert. denied*, —— U.S. ——, 118 S.Ct. 639, 139 L.Ed.2d 617 (1997). Thus, courts must always be on the lookout for the putative RICO case that is really "nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *In re Integrated Resources Real Estate*, 850 F.Supp. 1105, 1148 (S.D.N.Y.1993).

### (a) "Operation or Management"

In *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that a party will not be liable under 18 U.S.C. § 1962(d) "unless it has some part in directing the [RICO] enterprise's affairs." The Supreme Court also held that the "operation or management" test provides the appropriate standard for deter-

mining this element of RICO liability. *Id.* "As interpreted by courts in this district and others, the 'operation and management' test ... is a very difficult test to satisfy." *LaSalle Nat'l, Bank v. Duff & Phelps Credit Rating Co.*, 951 F.Supp. 1071, 1090 (S.D.N.Y. 1996). As the Second Circuit has held, "simple taking of directions and performance of tasks that are 'necessary and helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994). "Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable as a result." *LaSalle*, 951 F.Supp. at 1090 (quoting *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir.1993)). There is a "substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because 'the test is not involvement but control.'" *Dep't. of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 466 (S.D.N.Y.1996) (quoting *A.I. Credit Corp. v. Hartford Computer Group, Inc.*, 847 F.Supp. 588, 601 (N.D.Ill.1994)). Or, as another court has stated, "it is not the importance of such services that determines § 1962(c) liability, but whether the provision of these services allows the defendant to direct the affairs of the enterprise." *In the Matter of Lake States Commodities, Inc.*, 936 F.Supp. 1461, 1477 (N.D.Ill.1996).

Accordingly, courts within this circuit have repeatedly dismissed RICO claims which failed to meet these stringent standards. *See e.g.*, *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2d Cir.1994) (dismissing RICO claim on grounds that provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191 (JFK), 1997 WL, 603496 at *5 (S.D.N.Y. Sept.30, 1997) (dismissing RICO claim where amended complaint alleged facts tending to show that defendants participated in the enterprise's affairs but was "devoid of allegations suggesting that [they] had some part in directing the enter-

prise's affairs"); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 254 (S.D.N.Y.1997) ("the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself"); *Sundial Int'l, Fund v. Delta Consultants, Inc.,* 923 F.Supp. 38, 41 (S.D.N.Y.1996) (dismissing RICO claims against individual bank officer and banks who held investors' deposits in fraud scheme because the banks did not solicit the investments or direct the affairs of the operation); *Lake States Commodities, Inc.,* 936 F.Supp. at 1476–77 (dismissing RICO claim on grounds that services rendered by defendant, while "essential" to the enterprise, did not amount to direction of its affairs); *Industrial Bank of Latvia v. Baltic Fin. Corp.,* 93 Civ. 9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 24, 1994) (dismissing RICO claim against bank and individual officers on the grounds that "provid[ing] banking services—even with knowledge of the fraud—is not enough to state a claim under [RICO]"); *Amalgamated Bank of N.Y. v. Marsh,* 823 F.Supp. 209, 221 (S.D.N.Y.1993) (dismissing RICO claim where amended complaint failed to suggest that defendant "exerted control" over RICO enterprise); *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants, S.R.L.,* 832 F.Supp. 585, 591 (E.D.N.Y.1993) (dismissing RICO claim against attorney whose "role was confined, at all times, to providing legal advice and legal services" and noting that "even when professionals go beyond their customary role, they will not be deemed to have participated in 'the operation or management of the enterprise itself.'"); *Morin v. Trupin,* 835 F.Supp. 126, 135–36 (S.D.N.Y.1993) (dismissing RICO claim against attorneys on grounds that their alleged actions only "capacitat[ed] the operation of the enterprise," but did not amount to its operation or management).

█ There is no doubt that plaintiffs have alleged wrongful acts that were allegedly of real importance to Schick's scheme. These

include allowing Schick access to the escrow accounts, approving Schick's overdrafts on 500 separate occasions, failing to notify the relevant authorities of the irregularities in the Schick accounts, misrepresenting to investors the status of the accounts and helping Schick to conceal the scheme generally. However, when reduced to their essentials, these are really allegations of *assistance* to the alleged RICO enterprise, not direction of it. Indeed, in their opposition memorandum, plaintiffs[4] summarize their "operation and management" argument by asserting that "Fleet and Patnoi knowingly *allowed* Schick to accomplish what he clearly could not do on his own, namely empty the Accounts of all deposits despite the protections written into agreements." (*Schmidt/Fragin* Mem. at 14) (emphasis supplied). Similarly, the *Zeligfeld* Amended RICO Statement characterizes Fleet's "operation and management" of the enterprise by stating that "Fleet knowingly *allowed* and actively *assisted* Schick in the violation of his escrow agreements with the plaintiffs . . . ." (*Zeligfeld* Am. RICO Statement at 1.) (emphasis supplied). The *Zeligfeld* Amended Complaint describes Patnoi's "management and control of the enterprise and its affairs" as consisting of "*allowing* Schick to loot the escrow accounts of his investors [and] by constantly ensuring that checks were covered and that overdrafts were approved . . . ." (*Zeligfeld* Am. Compl. ¶ 150) (emphasis supplied).

The inadequacy of plaintiffs' allegations is made clear by comparison to other cases in this circuit in which RICO claims survived challenges on "operation or management" grounds. For example, in *Burke v. Dowling,* 944 F.Supp. 1036, 1055 (E.D.N.Y.1995), the amended complaint alleged that the defendant "helped to initiate the scheme" and "exerted substantial control over the other defendants." In *131 Main Street Assoc. v. Manko,* 897 F.Supp. 1507, 1527–28 (S.D.N.Y. 1995), the defendants were "key" "insiders" who allegedly "orchestrated" a group of persons and "helped determine the enterprise's modus operandi and . . . 'managed' its basic structure." In *Tribune Co. v. Purcigliotti,*

---

**4.** Plaintiffs have all adopted and incorporated by reference each other's arguments. Accordingly, arguments advanced by one plaintiff are attributed to all.

869 F.Supp. 1076, 1097 (S.D.N.Y.1994), aff'd., 66 F.3d 12 (2d Cir.1995), the complaints alleged "that 'the defendants conceived of and implemented' the scheme, including 'coordinat[ing] and orchestrat[ing]' the filing and prosecution of false individual workers' compensation claims." With regard to certain defendants who had moved to dismiss, the complaint alleged that they had "helped devise the fraudulent scheme, played an integral role in managing the scheme and directed others to act in furtherance of the scheme." Id. at 1098. With regard to other moving defendants, the complaint alleged that they " 'participated in the development and implementation of the fraudulent scheme,' and 'coordinated the scheme' by contacting their members, informing them of the concerted action and directed them to take certain actions to carry out the scheme." Id. at 1099.

The weakness of plaintiffs' allegations with regard to the Fleet Defendants is also highlighted by comparison to the allegations against Schick, who clearly did operate and manage any RICO enterprise that may have existed. For example, the Schmidt, Zeligfeld and Feinstein Complaints all begin with assertions that the respective actions arise out of a fraud "orchestrated" and/or "perpetrated" by Schick (Schmidt Am. Compl. ¶ 1, Zeligfeld Am. Compl. ¶ 1, Feinstein Am. Compl. ¶ 1). The Second Amended Fragin Complaint also alleges that Schick "orchestrated a massive, fraudulent scheme" (Second Am. Fragin Compl. ¶ 6) and is replete with allegations identifying Schick as the driving force behind the fraud (Second Am. Fragin Compl. ¶¶ 36–39, 78–81, 118, 130). According to Feinstein's RICO Statement, "Schick orchestrated the fraudulent scheme ... and was the primary figure in the racketeering enterprise." (Feinstein RICO Statement ¶ 3.) Tellingly, the factual recitations in three of the complaints begin with the heading "Schick's Scheme." (Schmidt Am. Compl. ¶ 29, Zeligfeld Am. Compl. ¶ 6, Feinstein Compl. ¶ 14.) Absent such allegations with regard to the Fleet Defendants, this case "is more appropriately adjudicated as a fraud claim under state statutory or common law, not RICO." Brookes v. August 22 Develop-

ment, No. 3:96CV655 (AHN), 1997 WL 76664, at * 5 (D.Conn. Feb.7, 1997).

Finally, plaintiffs urge the Court to take heed of Judge Leisure's statement that it is "not always ... reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a [defendant]... participated in the 'operation or management' of the enterprise." Friedman v. Hartmann, No. 91 Civ. 1523(PKL), 1994 WL 376058, at *2 (S.D.N.Y. July 15, 1994). While we agree with Judge Leisure, we note that in this case plaintiffs clearly "had the benefit of access to an extensive paper trail" in framing the amended complaints. Id. Indeed, in their opposition to Fleet's motion to dismiss, plaintiffs state "Over the past several months, starting with the Schick deposition taken on February 9–10, 1998, ... and continuing with ongoing discovery, Plaintiffs have uncovered additional, compelling information confirming RICO violations and fraud on the part of Fleet and Patnoi". (Schmidt/Fragin Mem. at 4.) In a declaration submitted in opposition to Fleet's motion to dismiss, Feinstein's attorney states that "As to the Fleet motion to dismiss the RICO claims, Mr. Feinstein, through counsel, was familiar prior to the filing of his complaint with the new information provided by the deposition of David Schick and by the documents produced by Fleet Bank." (Declaration of Brian E. Maas dated June 1998 ¶ 6.) Moreover, in another declaration submitted in opposition to Fleet's motion, an attorney representing Fragin and the Schmidt plaintiffs states "discovery in the Schmidt case has been ongoing and continues to proceed ... I have examined the documents thus far received from Fleet, and I have uncovered information that is relevant ...." (Declaration of Daniel L. Abrams in Opposition to Motion to Dismiss ("Abrams Decl.") ¶ 2.) Internal Fleet documents relating to the accounts at issue are attached to this declaration as exhibits. As one court within this circuit has noted under similar circumstances,

If plaintiff's argument were to succeed, every case in which an isolated or sporadic fraud was alleged would have to proceed to

discovery under RICO, since it is always possible that further discovery will show that there is a threat that alleged racketeering activity will continue in the future. The mere fact that such cases are dismissed routinely demonstrates that plaintiff's argument that he is entitled to conduct a 'fishing expedition' in the absence of any evidence that there has been a pattern of racketeering activity is unfounded in the law.

*Giannacopolous v. Credit Suisse,* 965 F.Supp. 549, 553 (S.D.N.Y.1997) (citations omitted). So too, in this case, plaintiffs' claimed need for further discovery, in light of the discovery that has already been taken, is insufficient to defeat defendants' motions to dismiss.

### (b) Enterprise

The complaints also fail to allege adequately that the Fleet Defendants, together with Schick and the entities he controlled, constituted a RICO "enterprise."

A RICO enterprise is statutorily defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In interpreting this statute, the Supreme Court has defined a RICO enterprise as a "group of persons associated together for a common purpose of engaging in a common course of conduct...." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The existence of a RICO enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

■■■ The RICO enterprise in this case is alleged to be an association-in-fact, rather than a legal entity. "The existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.'" *United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991) (quoting *United States v. Bagaric,* 706 F.2d 42, 56 (2d Cir.1983)). In determin-

ing whether the members of a purported association-in-fact functioned as a unit, "[c]ourts in the Second Circuit must look to the 'hierarchy, organization, and activities'" of the association. *First Nationwide Bank v. Gelt Funding Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993) *aff'd.,* 27 F.3d 763 (2d Cir. 1994) (quoting *Coonan,* 938 F.2d at 1560–61). Consistent with these standards, "a RICO enterprise must exhibit structural continuity over its alleged lifespan." *Kovian v. Fulton County Nat'l. Bank and Trust Co.,* No. 86–CV–154, 1990 WL 36809, at *16 (N.D.N.Y. March 28, 1990). As the Eighth Circuit has explained, "[c]ontinuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *Handeen v. Lemaire,* 112 F.3d 1339, 1351 (8th Cir.1997) (quoting *United States v. Kragness,* 830 F.2d 842, 856 (8th Cir.1987).)

■■■ In addition, the RICO enterprise must always have an ascertainable structure distinct from that inherent in the conduct of a "pattern of racketeering." As the Supreme Court stated in *Turkette,* "[t]he enterprise is not the 'pattern of racketeering'; it is an entity separate and apart from the pattern of activity in which it engages." 452 U.S. at 583, 101 S.Ct. 2524. The enterprise "cannot simply be ... the minimal association which surrounds the [pattern racketeering] acts." *Stephens, Inc. v. Geldermann, Inc.,* 962 F.2d 808, 815 (8th Cir.1992) (quoting *United States v. Bledsoe,* 674 F.2d 647, 664 (8th Cir.1982)). In other words, the members of "the group as a whole must have a common link other than the racketeering activity." *McDonough v. National Home Ins. Co.,* 108 F.3d 174, 177 (8th Cir.1997). Thus, "[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering," it is appropriate to consider whether "the enterprise would still exist were the predicate acts removed from the equation." *Handeen,* 112 F.3d at 1352.[5]

---

**5.** *Moss v. Morgan Stanley,* 719 F.2d 5 (2d Cir. 1983) is not to the contrary. In *Moss,* the Second Circuit explicitly rejected the Eighth Circuit's view that the evidence offered to prove the "enterprise" and the "pattern of racketeering" must necessarily be distinct and held that a RICO

The complaints in this case fail to allege a continuous structure in the enterprise. In describing the different roles played by the members of the enterprise, the complaints basically restate the allegations against each of the defendants without explaining the interrelationship of these actions or defining coordinated roles played by the enterprise's members. There is no allegation of any kind of chain of command or functional integration, as is typical of classic RICO enterprises. The only common factor joining the various defendants is their alleged participation in Schick's scheme to defraud the plaintiffs. The complaints do not allege facts sufficient to support an inference that the enterprise existed as a continuous structure "separate and apart" from the commission of the predicate acts alleged, or that there was an organized mechanism for directing the enterprise's affairs on an ongoing basis beyond the fraudulent scheme alleged.[6] *See e.g., Ray v. Gen. Motors Acceptance Corp.,* No. 92 Civ. 5043, 1995 WL 151852, at *3 (S.D.N.Y. Mar.28, 1995) (dismissing RICO claim alleging secondary liability in Ponzi scheme where plaintiff failed to plead with sufficient particularity the requisite elements that defendant was associated with an enterprise, and that the enterprise was separate and distinct from the alleged pattern of racketeering activity). *See also Stephens,* 962 F.2d at 815–16 (affirming district court's finding that plaintiff had failed to establish a RICO claim because the members of the alleged RICO enterprise were linked only by the fact of their "direct or indirect participation" in the scheme to defraud plaintiff). As at least one other court has held, when considering similar allegations of a Ponzi scheme allegedly operated as a RICO enterprise, "[i]f the purpose of the entity or the association in fact was to defraud the investors, then it has no continuity or distinct structure beyond the alleged conspiracy." *Latimer v. Hall Financial Group,* No 90 C 0156, 1990 WL 133225, at * 10 (N.D.Ill. Sept.13, 1990). In short, the enterprise in this case likely would not exist "were the predicate acts removed from the equation." *See also Bernstein v. Misk,* 948 F.Supp. 228, 235 (E.D.N.Y.1997) (dismissing RICO claim where complaint failed to identify, *inter alia,* structure and "functional unity" of the alleged RICO enterprise); *First Nationwide,* 820 F.Supp. at 98 (dismissing RICO claim where complaint failed to allege how the perpetrators of a series of "discontinuous independent frauds" were associated together in an enterprise and "common sense" did not support the existence of such an enterprise); *Cullen v. Paine Webber Group,* 689 F.Supp. 269, 273 (S.D.N.Y.1988) (clients of various brokers whose only link was the broker did not form an enterprise within meaning of RICO statute); *Moll v. U.S. Life Title Ins. Co. of N.Y.,* 654 F.Supp. 1012, 1032 (S.D.N.Y.1987) (dismissing RICO claim for failure to allege enterprise where complaint alleged that enterprise members shared common purposes but failed to "specify how these members joined together as a group to achieve these purposes"). *Compare In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 454 (S.D.N.Y.1998) (enterprise properly alleged where complaint explained that defendants opened joint trading accounts in name of one defendant but as to which other defendants had power of attorney and some role in management of trading and defendants used the joint accounts to coordinate their trading in an effort to manipulate copper prices).

---

enterprise need not have an " 'economic goal … apart from the commission of the predicate acts.' " *Id.* at 22. However, *Moss* does not alter the basic rule of *Turkette* that the enterprise must have an ascertainable structure distinct from the pattern of racketeering, and cannot simply be the sum of the predicate acts.

**6.** In their RICO statements, the plaintiffs allege that the pattern of racketeering activity and the enterprise were separate and distinct because the usual activities of the enterprise included lawful banking activities carried out by Fleet. (*See, e.g., Fragin* Am. RICO Statement at ¶ 7, *Schmidt* Am. RICO Statement at ¶ 7.) However, this allegation, in and of itself, is insufficient to establish that the enterprise and the pattern are separate and distinct. *See McDonough,* 108 F.3d at 177 ("[t]hat each member of a group carries on activities distinct from the pattern of racketeering is insufficient; the group as a whole must have a common link other than the racketeering activity.") and *Stephens,* 962 F.2d at 815 ("Although it is true that each member of this group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise.")

Moreover, the life of the enterprise is alleged to be at most 22 months, from April 29, 1994, when Fleet Account 1987 was opened, until February 28, 1996, the date of the last misrepresentation ascribed to Fleet. In *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held that RICO required a demonstration of "continuity over a closed period by proving a series of related predicates extending over a *substantial period of time.*" (emphasis added). In *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467–68 (2d Cir. 1995), the Second Circuit noted that since *H.J. Inc.*, it had found closed-ended continuity only twice, and only in circumstances involving predicate acts committed over a period in excess of two years. *Mason Tenders District Council Pension Fund v. Messera*, No. 95 Civ. 9341 1996 WL 351250, at *7 (S.D.N.Y. June 26, 1996). While the "continuity" issue is not dispositive here, we note that the maximum life span of the enterprise in this case is below the two-year threshold implied by *H.J., Inc.*, thus suggesting that this is not the kind of enterprise that RICO was intended to reach. *See, e.g., Kovian*, 1990 WL 36809, at *16 (dismissing RICO claim where complaint failed to allege an ongoing structure or hierarchy and offered no explanation as to how the enterprise "remained structurally intact from one scheme to the next"); *Moll*, 654 F.Supp. at 1032 (dismissing RICO claim for failure to allege enterprise where complaint lacked "factual allegations regarding the continuity of structure or personnel of this group.") *Compare Grunwald v. Bornfreund*, 668 F.Supp. 128, 134 (E.D.N.Y.1987) (enterprise properly alleged where complaint pleaded "detailed factual allegations showing literally hundreds of banking transactions over the course of several years" with the main defendant "operating as the group's hub.").

**(c) Respondeat Superior Liability**

Plaintiffs also seek to hold Fleet vicariously liable under RICO for the acts of Patnoi. Plaintiffs face a substantial burden, for as one court within this circuit has held, "vicarious liability has been held to be at odds with Congressional intent in enacting RICO since the statute was designed to protect corporations from criminal infiltration rather than hold them liable." *Qatar Nat'l. Navigation & Transp. Co. Ltd. v. Citibank, N.A.*, No. 89 Civ. 0464(CSH), 1992 WL 276565, at *7 (S.D.N.Y. Sept.29, 1992) (citations omitted). Or, Judge Cabranes has written, " 'invoking RICO's punitive, financially ruinous treble damage remedy' could conceivably interfere with the very market forces that RICO was designed to protect." *Gruber v. Prudential–Bache Sec.,Inc.*, 679 F.Supp. 165, 181 (D.Conn.1987) (quoting Note, Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Corporate Liability, 65 B.U.L.Rev. 561, 603 (1985).)

Consistent with these principles, courts in this circuit have generally been hostile to claims of vicarious liability under RICO. *See, e.g., DeJesus v. Sears, Roebuck and Co.*, No. 93 Civ. 2605(MBM), 1995 WL 122726, at *4 (S.D.N.Y. Mar.22, 1995) (in the Second Circuit vicarious liability under civil RICO is available "only in limited circumstances, such as where 'the corporation may fairly be said to be a central figure (or aggressor) in the alleged scheme.' ") (citations omitted); *Kahn v. Chase Manhattan Bank*, 760 F.Supp. 369, 373 (S.D.N.Y.1991) ("The weight of authority in this district and in other circuits is against such an application"); *Philan Ins., Ltd. v. Frank B. Hall, & Co.*, 748 F.Supp. 190, 198 (S.D.N.Y.1990) ("Corporate defendants cannot be held vicariously liable under RICO for the individual wrongdoing of their employees on a theory of respondeat superior where plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme.") (citations omitted); *Amendolare v. Schenkers Intern. Forwarders, Inc.*, 747 F.Supp. 162, 168 (E.D.N.Y.1990) ("[s]everal courts have thus determined that vicarious liability under RICO is only permitted when the defendant corporation can be characterized as the 'central' or 'controlling' figure in the RICO enterprise.") (citations omitted).[7]

---

7. *United States v. Paccione*, 949 F.2d 1183 (2d Cir.1991) and *Pollack v. Laidlaw*, No. 90 Civ. 5788(DLC), 1995 WL 261518 (S.D.N.Y. May 3, 1995), cited by plaintiffs, are not to the contrary.

*Amendolare* distinguished for purposes of vicarious RICO liability "between 'aggressor' corporations that are central figures in the unlawful scheme and 'conduit' corporations that unknowingly facilitate the illegal behavior" and noted that most courts "have declined to subject the [latter] to RICO liability." *Id.* As Judge Cabranes has written, in determining whether a corporation is a "central figure" for purposes of vicarious RICO liability,

> it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high corporate level has been determined, the court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefited from the racketeering activity.

*Gruber,* 679 F.Supp. at 181. However, "the fact that a corporation benefits from an illegal scheme does not in itself establish that the corporation participated as a 'central figure' in that scheme." *Id.*

■ When considered in light of the *Gruber* factors, plaintiff's allegations are insufficient to allege a basis on which Fleet can be held vicariously liable. Plaintiff's most serious allegations relate to Patnoi, a Fleet Vice-President and Branch Manager. However, the allegations do not suggest that Patnoi was operating at a particularly high corporate level. For example, plaintiffs describe Patnoi's activities as "opening the Account [that held most of plaintiffs' funds], supervising the flow of funds into and out of the Account, communicating with the escrow agent and with Feinstein regarding the sta-

tus of the Account, and signing off on transfers and overdrafts under $250,000 ..." (*Schmidt/Fragin* Mem. at 8.) There is no allegation that Patnoi set general corporate policies at Fleet and the very fact that he did not have authority to approve overdrafts over $250,000 (repeatedly mentioned by plaintiffs) indicates that his authority was limited. In their RICO statements, plaintiffs have also made vague allegations regarding Patnoi's "supervisors," Jane Manditch, James Weissman, David Kurland and Carol Pelisson. (*See, e.g., Schmidt* Am. RICO Statement at 3 n. 1.) However, they do not identify the job titles or positions of these supervisors who are, in any event, alleged only to have approved Schick's overdrafts. Such allegations, without more, do not suggest knowledge of, or reckless indifference towards, Schick's unlawful activity at a sufficiently high corporate level. *See e.g., Qatar,* 1992 WL 276565, at *8 (refusing to impose vicarious RICO liability on bank for actions of employee who was both an Assistant Vice–President and Branch Manager whose actions were undertaken without bank's knowledge); *Greyhound Fin. Corp. v. J.R. Willyard,* No. 87–C–0911B, 1989 WL 201094, at *25 (D.Utah Dec.26, 1989) (granting summary judgment on RICO claim where plaintiff was unable to offer evidence of banks' participation in fraud at level of its controlling officers and directors), *Continental Data Sys., Inc. v. Exxon Corp.,* 638 F.Supp. 432, 440 (E.D.Pa.1986) (corporation not vicariously liable under RICO for actions of branch manager, marketing manager and senior sales representative).

Moreover, for the reasons stated above, the complaint does not adequately allege that Fleet was an "aggressor" or "central figure" in Schick's scheme. There is no allegation that it initiated, orchestrated or directed the scheme, or that it was the main beneficiary of the scheme. At most, it is alleged to have

In *Paccione,* two companies were held criminally liable under RICO for actions taken by an individual defendant, Vulpis. 949 F.2d at 1200. In addition to being a 50% owner of each of the companies, Vulpis was also an officer of each corporation, "largely ran their operations," and "saved the ... companies millions of dollars" by participating in the criminal scheme. *Id.* Plaintiffs have not, and cannot, make any comparable

allegations with regard to Patnoi's role at Fleet. *Pollack* relied exclusively on *Paccione* to hold that vicarious RICO liability is generally available in this circuit. 1995 WL 261518, at * 20. This court does not read *Paccione* so broadly. *See e.g. DeJesus,* 1995 WL 122726, at * 4 (noting, after *Paccione,* that "courts in this Circuit have recognized such theories for civil RICO actions only in limited circumstances ....")

provided assistance to Schick by failing to detect and stop Patnoi's corruption and Schick's fraud at an earlier stage. This is an insufficient basis on which to subject a national bank to vicarious RICO liability. *See Ray*, 1995 WL 151852, at *8 n. 14 (declining to impose vicarious civil RICO liability on corporation that was not an active participant in alleged Ponzi scheme); *Laro, Inc. v. Chase Manhattan Bank*, 866 F.Supp. 132, 140 (S.D.N.Y.1994), *aff'd.*, 60 F.3d 810 (2d Cir. 1995) (dismissing RICO claim against bank absent evidence that bank was a "central figure" or beneficiary of fraud carried out by one of its loan officers); *In re Thomson McKinnon Securities Inc., v. Bank of New York*, 147 B.R. 330, 333 (Bkrtcy.S.D.N.Y. 1992) (dismissing civil RICO claim against bank on grounds that plaintiff failed to allege facts supporting an inference that defendant bank knowingly participated in the racketeering activity); *Qatar*, 1992 WL 276565, at *9 (dismissing civil RICO claim where plaintiff failed to plead facts supporting an inference that bank employee perpetrated fraud for benefit of bank); *Philan*, 748 F.Supp. at 198 (dismissing RICO claim where plaintiff failed to allege facts portraying corporate defendant "as an active perpetrator of the fraud or a central figure in the criminal scheme"); *Gruber*, 679 F.Supp. 165 at 179, n. 25 and 181–82 (dismissing claim of vicarious RICO liability due to absence of allegations that defendant corporation was a "central figure" in the scheme or that it developed "policies" that fostered fraud promoted by low-level representative).

### (d) RICO Conspiracy

 All plaintiffs have charged Fleet with RICO conspiracy under 18 U.S.C. § 1962(d). Under 18 U.S.C. § 1962(d), a party is liable for RICO conspiracy if it knew of the conspiracy's goals and agreed to facilitate them. *Salinas v. United States*, 522 U.S. 52, ——, 118 S.Ct. 469, 477–78, 139 L.Ed.2d 352 (1997). However, the Second Circuit has held that there can be no RICO conspiracy without a substantive RICO violation. Thus, if "the prior claims do not state a cause of action for substantive violations of RICO," then a RICO conspiracy claim necessarily "does not set forth a conspiracy to commit such violations." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 49, 139 L.Ed.2d 14 (1997), and *cert. granted*, —— U.S. ——, 118 S.Ct. 1298, 140 L.Ed.2d 465 (1998).[8] *See also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3rd Cir.1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."); *Goldberg v. Lynch*, No. 97 Civ. 8779 1998 WL 321446, at * 3 (S.D.N.Y. June 18, 1998) (dismissing RICO conspiracy claim for failure adequately to allege RICO enterprise); *NRB Indus., Inc. v. R.A. Taylor & Assoc., Inc.*, No. 97 Civ. 181 1998 WL 3638, at *3 (S.D.N.Y. Jan. 7, 1998) (Rakoff, J.) ("because the claims under sections 1962(a) and (c) fail as a matter of law, the conspiracy claim under section 1962(d) likewise must be dismissed"); *Katzman*, 167 F.R.D. 649, 658 ("failure to adequately plead

---

8. We note, parenthetically, that *Discon* is at odds with *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994). In *Viola*, the Second Circuit held that reversal of a criminal § 1962(c) conviction on the grounds that the defendant did not participate in the "operation or management" of the RICO enterprise does not require automatic reversal of his RICO conspiracy conviction because "[a] defendant can be guilty of conspiring to violate a law even if he is not among the class of persons who could violate the law directly." 35 F.3d at 43. *See also Madanes v. Madanes*, 981 F.Supp. 241, 258 (S.D.N.Y.1997) ("the question is whether someone can be guilty of a RICO conspiracy even if he cannot be characterized as an operator or manager of a RICO enterprise under *Reves*. In the Second Circuit, the answer is yes.") Insofar as *Discon* was decided after *Viola*, we consider *Discon* to state the governing law on this subject. *Discon* might be reconciled with *Viola* by a rule requiring dismissal of § 1962(d) claims if the underlying § 1962(c) claim fails on enterprise grounds, but not if it fails only on "operation or management" grounds. However, such a rule would risk rendering *Reves* "almost nugatory." *Madanes*, 981 F.Supp. at 259, n. 16 (quoting David B. Smith & Terrance G. Reed, *Civil RICO* ¶ 5.04, at 5–40.2 (1994)). In any event, we need not reach this issue because the underlying substantive claims in this case fail to allege either a RICO enterprise or that the Fleet defendants operated or managed such an enterprise. The RICO conspiracy claim also fails to allege an agreement between Schick and the Fleet Defendants.

facts that would satisfy the pleading requirements of §§ 1962(a), 1962(b) or 1962(c) necessarily dooms any claim [plaintiff] might assert arising under § 1962(d).". In this case, for the reasons stated above, plaintiffs have failed adequately to allege a § 1962(c) violation. Accordingly, the RICO conspiracy claims are dismissed as well.

 Alternatively, plaintiffs' RICO conspiracy claims against Fleet are dismissed because the complaints fail to provide specific factual allegations supporting an inference that Fleet entered into an agreement to facilitate the goals of Schick's enterprise. "Bare and conclusory allegations are insufficient to withstand a motion to dismiss and a plaintiff must plead facts sufficient to show that each defendant knowingly agreed to participate in the conspiracy." *Colony at Holbrook, Inc. v. Strata G.C., Inc.,* 928 F.Supp. 1224, 1238 (E.D.N.Y.1996). The complaints fail to meet this standard. For example, the Second Amended *Fragin* Complaint, which is the most specific with regard to this issue, states simply:

> The Fleet Defendants, by their words and/or actions, manifested their agreement that each would commit, agree to commit, or conspire to commit, two or more of the racketeering acts set forth hereinabove, in furtherance of the common purpose of the Fleet Enterprise, and for the purpose of conducting or participating, directly and/or indirectly, in the conduct of the affairs of the Fleet Enterprise through a pattern of racketeering activity.

(Second Am. *Fragin* Compl. ¶ 150.) This allegation, without more specifics, is insufficient to show that Fleet "knowingly agreed to participate in the conspiracy." By the same token, the complaints do not adequately allege that Fleet understood the scope of the enterprise or "knew what Schick and the other members of the enterprise were up to." *Viola,* 35 F.3d at 44. The Second Amended *Fragin* Complaint (the most detailed of the complaints with regard to this issue) alleges in conclusory fashion that the "Fleet Defendants understood the scope of the Fleet Enterprise, and agreed to further its affairs through the commission and facilitation of various racketeering acts ...." (Second Am.

*Fragin* Compl. ¶ 149.) Again, such a conclusory allegation, devoid of supporting factual allegations, is insufficient to allege that Fleet understood the full scope of Schick's fraudulent undertaking. For the reasons stated above, Patnoi's knowledge of the scope of the enterprise is not properly attributable to Fleet for purposes of imposing civil RICO liability.

**(e) Scienter**

The Fleet Defendants argue that the complaints should be dismissed for failure to allege scienter on their part. Because the RICO claims are insufficient as a matter of law for the reasons stated, we need not reach this issue.

**IV. State Claims**

As detailed *supra,* plaintiffs have also asserted a myriad of claims under state law. There is no federal jurisdiction over these claims, and the Court declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

 Fleet has submitted the affidavit of Jana J. Litsey, an assistant Vice President of Fleet Bank, N.A., stating that on May 1, 1996 Fleet Bank of New York, N.A. and Nat West Bank, N.A. consummated a merger. (Declaration of Jana J. Litsey dated June 2, 1998 ("Litsey Decl.") ¶ 2.) The surviving entity of that merger was NatWest Bank, N.A., which was renamed Fleet Bank, N.A., a federally chartered national bank with its principal place of business located in Jersey City, New Jersey. (Litsey Decl. ¶ 2.) In addition to having its principal place of business in New Jersey, Fleet has substantial operations, including numerous branches, in New Jersey. (Litsey Decl. ¶ 3.) Under 28 U.S.C. § 1348, a national banking association is located in, and therefore a citizen of, every state in which it maintained branch banks. *Bank of New York v. Bank of America,* 861 F.Supp. 225, 230 (S.D.N.Y.1994), *Connecticut Nat'l Bank v. Iacono,* 785 F.Supp. 30, 34 (D.R.I.1992) (same). *See also Norwest Bank Minnesota, N.A. v. Patton,* 924 F.Supp. 114, 115 (D.Colo.1996) (dismissing action brought by bank on jurisdictional grounds because bank had substantial presence and branch

offices in state of which plaintiff was also a citizen). Accordingly, as plaintiffs concede, Fleet has been a citizen of both New York and New Jersey since the filing of this case [9] and there is no diversity jurisdiction in any of the captioned matters. *See Wigand v. Flo-Tek, Inc.,* 609 F.2d 1028, 1031 (2d Cir.1979) (if complete diversity does not exist as of the commencement of suit, state claims should be dismissed for lack of jurisdiction).

Plaintiffs urge the Court to exercise its discretion under 28 U.S.C. § 1367(c) and maintain supplemental jurisdiction over the state claims. However, as the Second Circuit held in *Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991), a district court should not maintain jurisdiction over ancillary state claims "even though not insubstantial" if the federal claims are dismissed before trial (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). *See also Calzaturificio Rangoni S.p.A. v. United States Shoe Corp.,* 868 F.Supp. 1414, 1421 (S.D.N.Y.1994) ("Where federal claims are disposed of before trial, it is appropriate for the pendent state claims to be dismissed as well.") Although the Court has invested a substantial amount of time in these actions, we are not presented with sufficiently compelling circumstances to warrant the maintenance of pendent jurisdiction over state claims. As plaintiffs themselves point out, document production has been only "partial" and no depositions have been taken. (*Schmidt/Fragin* Mem. at 20.)

Accordingly, plaintiffs in each of the captioned actions shall have twenty (20) days from the date of this order to inform the Court whether they intend to file amended complaints that do not name Fleet as a defendant or whether they wish to pursue their remedies in state court. Any actions in which the plaintiffs do not file amended complaints that do not name Fleet as a defendant shall be closed in their entirety, without prejudice to plaintiffs' rights to reinitiate the action in state court. Until plaintiffs inform

the Court of their intentions, Sterling's motions to dismiss the state claims in *Schmidt* and *Feinstein* will be held in abeyance.

SO ORDERED.

---

**9.** The oldest of the captioned cases, *Schmidt,* was commenced on July 2, 1996, approximately two months after the Fleet merger.