■ GARY FRAGIN, Appellant, v FLEET BANK, Respondent, et al., Defendant. (And a Third-Party Action.) [787 NYS2d 278]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered April 15, 2004, which granted defendant Fleet Bank's motion for summary judgment dismissing the complaint, unanimously reversed, on the law, without costs, the motion denied and the complaint reinstated as against said defendant.

This action arises out of defendant Fleet Bank's asserted breach of a promise made by defendant Leonard Patnoi, the manager of Fleet's Hewlett, Long Island branch, to establish an attorney escrow account requiring dual signatures for withdrawals. The designated signatories were to be nonparty David Schick and third-party defendant Edward Burnbaum, attorney to plaintiff Gary Fragin. It is uncontroverted that the contemplated restricted account was never opened and that Fragin's funds were instead deposited into a regular checking account maintained by Schick at the Hewlett branch.

Plaintiff deposited some $4.5 million in the Fleet account in connection with an investment strategy suggested by his attorney, who had a long acquaintance with Schick, who was also an attorney. As Burnbaum understood it, Schick's company, Blackstone Associates, was seeking funds from investors to use as earnest money in connection with the purchase of real estate mortgage portfolios being auctioned by the Federal Deposit Insurance Corporation (FDIC) and, later, the Resolution Trust Company (RTC). A bidder was required to show that it had access to 10% of the price in order to establish its financial capability to consummate the purchase. Plaintiff's funds were to be held briefly in an account so that Blackstone could plausibly maintain that it had the necessary earnest money. Then the money was to be returned to plaintiff and the mortgage portfolio sold, at a profit, to another purchaser in a flip transaction without Blackstone having to tender any funds of its own. Plaintiff was to receive a 14% fee for providing the funds deposited with Fleet.

To protect his investment, plaintiff entered into an escrow agreement with Schick with respect to each transaction. The respective agreements provide that the deposited funds remain plaintiff's sole property; that Blackstone Associates has no right or interest in the funds; that no money can be transferred out

of the account without the signature of both Schick, as escrow agent, and Burnbaum, as plaintiff's attorney; and that the deposited funds will be repaid to plaintiff at the end of a 120-day escrow period.

According to an information filed in the District Court for the Eastern District of New York, "many of the real estate portfolios that Schick specifically identified to investors did not exist." The funds they advanced were typically used to pay phantom profits to previous investors or were simply converted by Schick. The information recites that "Schick misappropriated more than $80 million dollars in this manner" (*see Lerner v Fleet Bank, N.A.*, 146 F Supp 2d 224, 225-227 [ED NY 2001], *mod* 318 F3d 113 [2d Cir 2003], *cert denied* 540 US 1012 [2003]). Schick later pleaded guilty to fraud in the Federal District Courts for the Southern and Eastern Districts of New York (*see Schmidt v Fleet Bank*, 16 F Supp 2d 340, 344 [SD NY 1998]).

The instant complaint alleges that Fleet's branch manager received a certificate of authority and dual signature cards for opening the attorney escrow account and subsequently represented that the account would be protected by adequate safeguards. Notes of the conversation made by Burnbaum indicate that he specifically discussed the dual-signature requirement with Patnoi. The complaint asserts that these representations by the branch manager induced plaintiff to deposit his funds with the bank. The complaint seeks damages from defendants on theories of fraud, breach of contract and negligence.

Supreme Court granted defendant Fleet's motion for summary judgment dismissing the complaint. The court found that plaintiff was a party to an illegal scheme "to allow Schick to mislead and defraud the FDIC and RTC into believing that Schick had the requisite deposit money available to him" and concluded that "the misleading of the FDIC and/or the RTC makes it an illegal contract and acts as a bar to recovery." We disagree.

There is no evidence that any of the funds advanced by plaintiff were ever represented to the FDIC or RTC, either by Schick or Blackstone Associates, as the earnest money required of a bidder. As stated in the court's decision, "In the first four transactions, Schick transferred plaintiff's money out of the bank account and never entered into the mortgage flip transaction. He then paid plaintiff with other funds. In the last three transactions, however, Schick stole plaintiff's money and never repaid it." Schick was not prosecuted for defrauding the FDIC or RTC but for defrauding the investors in his Ponzi scheme,

and defendants have not shown that Fragin was aware that he was a knowing participant in a plan to defraud the banking agencies (*see Schmidt*, 16 F Supp 2d at 345). Finally, we agree with the Federal District Court that the defense of illegality "cannot be invoked by a bank which is the depository of funds in an illegal transaction, but not itself a party to the transaction" (*id.*, citing *Southwestern Shipping Corp. v National City Bank*, 6 NY2d 454 [1959]).

At a minimum, the evidence is sufficient to raise factual questions as to whether Fleet breached a promise, made by its branch manager, to open a particular account and whether Patnoi's assurances that the requested safeguards were in place induced plaintiff's reasonable reliance on the safety of the funds ultimately deposited. Fleet cannot reasonably argue that a branch manager lacks actual or apparent authority to bind it in the matter of opening an unremarkable bank account. Nor does the evidence establish that Patnoi was a party to the fraud. The record indicates that Patnoi was rewarded for attracting deposits to the Hewlett branch and that Schick accounted for "fifteen or 20 percent of the bank's deposits and activity," an amount in excess of $100 million in his own estimation. Thus, a jury might find that Fleet's manager placed the funds into Schick's existing, ordinary checking account out of a desire to curry favor with a major depositor and, therefore, acted in furtherance of his employer's interest in retaining a major account and not in aid of Schick's fraudulent scheme. The theft of plaintiff's funds does not constitute an intervening illegality since Schick's defalcations were the very risk against which Fleet, through Patnoi, promised protection (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315-316 [1980]).

Finally, Fleet has conceded that it discovered Patnoi's role in Schick's scheme and fired him in February 1996 (*see Schmidt*, 16 F Supp 2d at 345 n 2). Also, at the time of the last transaction in late February 1996, Schick's checking account had been closed. Schick, however, was able to induce plaintiff to believe that the funds were placed in the account by forging a Fleet deposit receipt. Under these circumstances, whether Fleet had a duty to notify plaintiff about the action taken against Patnoi presents a close factual question appropriately resolved on a full record. Concur—Tom, J.P., Andrias, Saxe and Marlow, JJ.