HIGHSPIRE, INC., Plaintiff,

v.

UKF AMERICA, INC. and Cedar Point Supply, Inc., Defendants.

No. 79 Civ. 1663(MP).

United States District Court,
S. D. New York.

May 1, 1979.

Gerwin & Ehrenclou, New York City by John P. Rowan, Peter Kupersmith, New York City, for plaintiff.

Christy & Viener, New York City by Arthur H. Christy, Jerome M. Lewine, Leonard J. Colamarino, New York City, for defendant UKF America, Inc.

Martin D. Dehler, Garden City, N. Y., for defendant Cedar Point Supply, Inc.

## DECISION

POLLACK, District Judge.

This is an antitrust suit brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 2 of the Clayton

Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13. The plaintiff has applied for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26.

Were the plaintiff to prevail herein it would have an adequate remedy at law. It has shown neither likelihood of success on the merits nor even sufficiently serious questions going to the merits to make them a fair ground for litigation. The facts are as follows.

The defendant UKF America, Inc., imports urea and allied products into the United States. UKF employs no salesmen but sells urea instead through independent distributors. One such distributor is the defendant, Cedar Point Supply, Inc., which distributes urea in the Northeast and Mid-Atlantic states. Under its agreement with UKF, Cedar Point purchases urea at the prevailing list price minus a distributor's discount of four percent. Cedar Point's obligations to UKF are secured by a personal guarantee of its president.

Until approximately July 1978, Cedar Point employed Mr. John Ryan as a salesman of urea and Mr. Joseph Brady as a financial analyst. At that time Ryan and Brady resigned from Cedar Point and formed Highspire, Inc., of which they are respectively president and vice-president, to sell agricultural chemicals in Delaware, Maryland, New Jersey, New York and Pennsylvania.

Ryan and Brady met with Messrs. J. W. H. Spin and Walter Maerz of UKF on August 4 and 11, 1978, to negotiate an agreement under which Highspire would distribute UKF urea. At the meeting on August 4, Highspire forecast to UKF that it would purchase and resell 25,000 to 30,000 tons of urea between July 1, 1978, and June 30, 1979. UKF demanded that Highspire submit for verification, either to UKF or an outside accounting firm, the resale contracts on which Highspire based its forecast of sales in excess of 25,000 tons. Highspire refused so to submit its contracts. In October, UKF advised Highspire that UKF would not enter a distributorship agree-

ment unless Highspire proved that it had contracts to sell 10,000 tons of urea. Highspire still refused to produce any contracts.

During the meeting on August 11, UFK also advised Highspire that it would have to post as security a letter of credit or personal guarantee for $100,000 as a further condition of obtaining a distributorship agreement. Ryan and Brady rejected personal guarantees but said that a letter of credit for $100,000 would not be a problem. At the same meeting, Highspire tendered a proposed agreement to UKF, but the representatives of UKF refused to sign because a distributorship agreement would first have to be approved by UKF's board of directors.

As a result of the negotiations on August 4 and 11, UKF sent Highspire a letter of intent on August 16, 1978. It provided:

It is contemplated that the parties shall negotiate and enter into a formal contract, at some time prior to September 30, 1978, pursuant to which UKFA shall sell to Highspire and Highspire shall purchase from UKFA 10,000 short tons of agricultural urea and 5,000 short tons of UAN [urea ammonium nitrates] (and possibly additional quantities, as may subsequently be considered), for delivery prior to June 30, 1979, which shall be the termination date of such contract.

Of such quantities, a minimum of 4,000 and a maximum of 8,000 short tons of agricultural urea shall be purchased by Highspire and delivered by UKFA during the fall 1978 season, with the balance being purchased and delivered in the spring 1979 season; and a minimum of 3,000 and a maximum of 4,000 short tons of UAN shall be purchased by Highspire and delivered by UKFA in the fall 1978 season, with the balance being purchased and delivered in the spring 1979 season.

The purchase price to be invoiced for all such orders shall be UKFA's price, F.O.B. car/truck at UKFA's Baltimore, Maryland warehouse, in effect at the time of shipment. . . .

UKFA shall allow Highspire, through December 31, 1978, a commission of 4% of UKFA's F.O.B. bulk price at the time of

shipment, as stated above, after deduction of freight and other allowances, if any. The parties shall negotiate and agree upon a commission rate, to be effective after December 31, 1978, which commission rate shall not be less than 4%.

.   .   .   .   .

As a condition to UKFA's entering into the proposed agreement and making any deliveries, UKFA shall receive an irrevocable standby letter of credit in the amount of $100,000 in form and substance satisfactory to UKFA.

.   .   .   .   .

It is understood that this letter shall be considered only as a letter of intent, and that the above terms and such other terms and provisions as the parties may deem appropriate, including the General Terms and Conditions of UKFA applicable to such transactions (a copy of which has been furnished to Highspire), shall be incorporated in a formal contract to be executed by the parties.

If the foregoing correctly sets forth our discussions and mutual intentions with respect to this matter, please so acknowledge by signing and returning to us the enclosed copy of this letter within 10 (ten) days.

Highspire's president signed and returned the letter of intent on August 29, accompanied by the following letter:

[W]e are returning the letter with reservations cited below. .

We have agreed to HIGHSPIRES' distribution of 20,000 tons of bulk urea, 10,-000 tons of solutions and hopefully 5,000 tons of bagged urea. The Letter of Intent cuts the urea and solutions in half over the time span August 1, 1978 through June 30, 1979.

The commission of 4% was originally agreed upon at 5%, this caused some dispute and was resolved at 4% through December 31, 1978. Commission from January 1, 1979 thru June 30, 1979 was to be renegotiated, hopefully upward. In light of the tonnage decrease, the commission of 4% is unacceptable.

The prerequisite $100,000 letter of credit is out of line relative to your credit requirements of parties of equal consequence.

We look forward to a meeting with UKFA promptly to resolve these differences.

Ryan and Brady of Highspire met with Spin and Mr. Jan Van Bussel of UKF on September 12, 1978. Spin and Van Bussel said that they had become unsure whether UKF could sell urea to Highspire because world market conditions had caused UKF's parent corporation to instruct UKF to reduce its sales of urea. Highspire and UKF met again on October 5, 1978. UKF agreed to accept a letter of credit for only $50,000, but continued to insist that Highspire submit its contracts for verification. Spin advised Brady that he would submit the proposal for a distributorship agreement with Highspire to UKF's board of directors at its next meeting.

On November 3, Highspire opened a letter of credit for $50,000 in favor of UKF.

Highspire then purchased seven lots of urea from UKF on November 7, 8 and 21 and December 7 and 12, 1978. Highspire paid $124.80 per short ton, or $130 per short ton minus a four percent discount. Highspire resold five of the seven lots for $130 per short ton and the other two for $122 per short ton as a "loss leader."

The board of UKF did not approve a distributorship agreement with Highspire. Maerz wrote to Brady on December 5, 1978, to explain the board's decision:

Due to the unsatisfactory market situation coupled with reduced value of the dollar, our purchase budget for 1979 was reduced to a level barely enough to cover our basic existing contractual sales obligations. Under these circumstances proposed new sales contracts—including one with Highspire—were not acted upon but placed on a follow-up status.

On January 8, 1979, Spin notified Ryan that UKF would sell urea to Highspire at list price without a distributor's discount, if Highspire renewed its letter of credit.

Highspire then approached approximately six other firms that sell urea in the Mid-Atlantic area and asked to buy urea at a distributor's discount. One of these firms offered to sell a "token" amount of urea, but the other five refused to sell at a distributor's discount because they employed their own salesmen, who competed with Highspire.

As of April 16, 1979, Highspire had no firm and binding contracts to sell urea to any of its customers.

In *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72, (2d Cir. 1979), the Court of Appeals set forth the following standard for a preliminary injunction:

> The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.

■ The plaintiff in this case has not shown that it will suffer irreparable harm if a preliminary injunction is not granted. The plaintiff has no firm and binding contracts to sell urea. Even if it did have such contracts, the plaintiff can buy urea from UKF and other firms at list price. In the event that the plaintiff prevailed in this case, its damages—the amount of the distributor's discount that it seeks from UKF—could be readily ascertained. Thus the plaintiff has an adequate remedy at law.

Nor has the plaintiff shown either likelihood of success on the merits or even sufficiently serious questions going to the merits to make them a fair ground for litigation. The plaintiff argues that UKF's refusal to grant a distributor's discount to Highspire constitutes price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13; that UKF has fixed the resale price of urea in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and that UKF has monopolized or attempted to monopolize the market in urea in the Mid-Atlantic states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

■ The Robinson-Patman Act does not apply unless the seller has made two actual sales to different purchasers at different prices. A sale at one price and a mere offer to sell at another price is not sufficient. *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); *F. Rowe, Price Discrimination Under the Robinson-Patman Act* 45–48 (1962). In this case, UKF's actual sales of urea to Highspire and Cedar Point were made at the same price, $124.80 per short ton, or $130 per short ton minus a discount of four percent. Thus the Robinson-Patman Act has no application here.

There is no evidence that UKF either acted unilaterally or agreed with others to fix the resale price of urea at its list price. On the contrary, both Highspire and Cedar Point resold urea at prices below UKF's list price.

Finally, there is no evidence that UKF monopolized or attempted to monopolize the market in urea in the Mid-Atlantic states. Numerous other firms sell urea in that area.

Consequently, the plaintiff is not entitled to the provisional remedy of a preliminary injunction and the same is hereby denied.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Fed.R.Civ.P.

SO ORDERED.