AMSTERDAM TOBACCO INCORPORATED, et al., Plaintiffs,

v.

PHILIP MORRIS INCORPORATED, Defendant.

No. 98 Civ. 3934(RMB).

United States District Court, S.D. New York.

May 17, 2000.

Ira Sturm, Raab & Sturm, LLP, NY, NY, Alan Trachtman, Liz McKenna, Dealy & Trachtman, LLP, NY, NY, for plaintiffs.

Jerome I. Chapman, Angela M. Pelletier, Arnold & Porter, Washington, D.C., Kent A. Yalowitz, Arnold & Porter, NY, NY, for defendants.

## ORDER

BERMAN, District Judge.

Amsterdam Tobacco Incorporated ("Amsterdam"), Boro Park Tobacco Company, Incorporated, The Koger Company, Incorporated, Queens Tobacco, Grocery & Candy Company, Incorporated, S/A Cigarette Company, Incorporated, and Sunrise Candy & Tobacco Corporation (collectively "Plaintiffs") filed this action on or about December 1, 1998, against Philip Morris Incorporated ("Philip Morris" or "Defendant") seeking $312,000,000.00 in damages for Philip Morris' alleged role in a cigarette smuggling enterprise operating from Virginia to New York. Amsterdam has brought this action under the Racketeering Influenced and Corrupt Organization Act of 1970 ("RICO"), 18 U.S.C. §§ 1961, 1962, 1964(a) and 1964(c); the Anti–Trust Procedural Improvements Act of 1980 ("Robinson–Patman Act"), 15 U.S.C. § 13, as well as under state law. Philip Morris now moves to dismiss the instant action, pursuant to Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6) and 9(b), arguing that Plaintiffs fail to state any claims for which relief can be granted. **For the reasons set forth below, Philip Morris' motion is granted.**

### I. Background

The following facts, which are set forth in Plaintiffs' Amended Complaint,[1] are taken to be true for the purposes of this motion. Amsterdam Tobacco Incorporated, Boro Park Tobacco Company, Incorporated, The Koger Company, Incorporated, Queens Tobacco, Grocery & Candy Company, Incorporated, S/A Cigarette Company, Incorporated, and Sunrise Candy &

---

1. Plaintiffs filed their original complaint in the Supreme Court for the City and County of New York on May 14, 1998. Defendant removed the case to the Federal District Court under 28 U.S.C. § 1441 on June 3, 1998. Following a pre-motion conference with United States District Court Judge Denny Chin on October 14, 1998, Plaintiffs served their Amended Complaint on December 1, 1998. The case was reassigned from Judge Chin to this Court on or about December 8, 1998.

Tobacco Corporation, are all licensed wholesale dealers of cigarettes with their principal places of business in New York City. (Am.Compl.¶ 3a–3f, 7). Philip Morris is in the business of manufacturing and distributing cigarettes and tobacco products; its corporate headquarters are located in New York City. (Am.Compl.¶ 9, 10).

Philip Morris has created and maintained corporate programs known as the "Retail Masters Program" and the "Wholesale Masters Program," both of which are designed to increase sales of its products across the United States. (Am. Compl.¶ 22). In order for a wholesaler to participate in the Wholesale Masters Program, it must provide information as to the identity, location, and amount of sales of Philip Morris' products, including the names and addresses of retailers, to Philip Morris on a weekly basis. (Am. Compl.¶ 26).[2] In order for a retailer to participate in the Retail Masters Program, it must provide information as to the wholesaler from whom the cigarettes were purchased and the amount of Philip Morris' products that were sold during any particular period. (Am.Compl.¶ 28). Philip Morris requires its salespeople periodically to visit the retail locations and to promote sales of its products at retail locations. (Am.Compl.¶ 29).

In Virginia, Philip Morris sells cigarettes directly to large retailers and distributors such as, for example, the Price Club and Sam's Club. (Am.Compl.¶ 33). These large retailers, it is alleged, either sell to a "second tier Virginia middleman" or directly to "smugglers" who travel (back and forth) to Virginia from New York or New Jersey. (*Id.*). The Virginia middlemen sell to "smugglers" from New Jersey or New York. (Am.Compl.¶ 34). The smugglers transport contraband cigarettes[3] to the New York City area where they distribute them to local retailers. (Am.Compl.¶ 35).

In or around December 1996, a Grand Jury in the Eastern District of Virginia handed down an indictment against six individual defendants and one corporate defendant ("Indictment"), alleging that these individuals and the corporation had engaged in a conspiracy willfully and unlawfully to ship, transport, receive, possess, distribute, sell, and purchase large quantities of contraband cigarettes in violation of 18 U.S.C. § 2342.[4] (Am. Compl.¶ 38). These defendants were not charged with a criminal RICO violation, under 18 U.S.C. §§ 1962, 1963. (Am. Compl.¶ 38). **Philip Morris was not among the indicted defendants in this cigarette smuggling case.** (*Id.*).

Between October 1996 and December 1996, several of the indicted defendants transported contraband cigarettes to New York without paying the required New

2. Retailers may (only) legally purchase cigarettes for sale within the State of New York from an agent licensed by the State and/or City of New York, or a wholesaler who in turn purchased the product from a licensed agent after an appropriate State and/or City cigarette tax stamp was affixed by the licensed agent. (Am.Compl.¶ 21).

3. If an excess of 300 cartons of cigarettes are transported across state lines without payment of applicable state taxes, the cigarettes are deemed "contraband." (Am.Compl.¶ 47).

4. In the past few years, the State of Virginia has, according to the Amended Complaint, experienced an "influx" of organizations and individuals who buy large quantities of cigarettes in Virginia and transport them out of state for resale in other states without paying

the applicable cigarette taxes in non-Virginia states. (Am.Compl.¶ 44). The state cigarette tax in Virginia is appreciably lower than in other states, such as New York. (Am. Compl.¶ 45).

In 1996, the United States Attorney for the Eastern District of Virginia commenced an investigation called "Operation Butt–Out" into the alleged transport of contraband cigarettes purchased in Virginia for sale in other states having substantially higher cigarettes taxes. (Am.Compl.¶ 178).

The investigation resulted in the Indictment and, ultimately, in the conviction of thirty-one defendants for violating various federal statutes, not, however, including the criminal RICO statute (18 U.S.C. §§ 1962, 1963). (Am.Compl.¶ 179, 180).

York cigarette taxes. (Am.Compl.¶ 139). Some of those cigarettes were purchased from the Price Club and Sam's Club in Virginia. (Am.Compl.¶ 139, 141, 150, 159). As a result of the efforts of a multi-state law enforcement task force, beginning in the Fall of 1994, many smugglers have been arrested and found to be in possession of contraband cigarettes. (Am. Compl.¶ 152–161). In connection with such arrests, Philip Morris brand cigarettes constituted a large portion of the contraband cigarettes recovered. (Am. Compl.¶ 162).[5]

Beginning in or about August 1994 and continuing through at least December 1996, statistically more cigarettes were sold in Virginia per capita "than could possibly have been consumed by the residents of Virginia," while statistically fewer cigarettes were sold lawfully in New York "than had been consumed by residents of New York State in the past." (Am. Compl.¶ 190).

The resellers of contraband cigarettes in New York were able to undercut the market price because they did not pay (and, therefore, did not have to absorb the cost of) the New York State and/or New York City cigarette taxes. (Am.Compl.¶ 199). As a result, Plaintiffs lost a significant amount of sales and profits. (*Id.*).

Philip Morris asserts here that none of Plaintiffs' legal theories supports Plaintiffs' central claim that Philip Morris was legally obligated to "police the marketplace" and enforce the laws against cigarettes smuggling. (Defendant's Moving Brief at 2). In the circumstances presented here, this Court agrees with Philip Morris.

---

5. Plaintiffs do not discuss what percentage of (all) cigarettes sold in Virginia are produced by Philip Morris.

6. In considering RICO claims, courts must attempt to achieve results "consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime." *United States v. Porcelli,* 865 F.2d 1352, 1362

## II. *Analysis*

### Motion to Dismiss Standard

In resolving a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This standard also applies to RICO claims. *See NOW v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). However, the court is not required in a RICO case to accept as true "conclusions of law or unwarranted deductions." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).[6]

### RICO Claim

Plaintiffs claim that Defendant violated 18 U.S.C. § 1962(c), which provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Specifically, Plaintiffs claim that they have alleged facts sufficient to support a prima facie case that there was an (illegal) enterprise and that Philip Morris has "employed a pattern of racketeering activity

---

(2d Cir.1989). Because the mere assertion of a RICO claim "has an almost inevitable stigmatizing effect on those named as defendants .... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990).

by participating in the conduct of the ongoing, continuous activities of the enterprise" which "has been the proximate cause of injuries to Plaintiffs' businesses." (Plaintiffs' Opposition Brief at 4).

Philip Morris argues that: 1) Amsterdam has failed to allege facts sufficient to establish that a RICO "enterprise" existed (18 U.S.C. § 1961[4] ); 2) Amsterdam has not alleged facts showing that Philip Morris "conducted or participated" in the alleged enterprise affairs (18 U.S.C. § 1962[c] ); and 3) Plaintiffs were not injured "by reason of" of a RICO violation involving Defendant (18 U.S.C. § 1964[c] ). (Defendant's Moving Brief at 2, 3).

### (a) Enterprise

■ An enterprise means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has defined a RICO enterprise as a "group of persons associated together for a common purpose of engaging in a common course of conduct ... proved by evidence of an ongoing organization, formal or informal, and by any evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Importantly, "[t]he enterprise is not the 'pattern of racketeering;' it is an entity separate and apart from the pattern of racketeering activity in which it engages." *Id.; see also Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 349 (S.D.N.Y.1998). The definition of "enterprise" is the same for both civil and criminal RICO violations. 18 U.S.C. §§ 1961(4), 1962.

The central allegations in the Indictment (in the United States District Court for the Eastern District of Virginia) are that the seven named defendants conspired to transport and sell contraband cigarettes in interstate commerce and conducted financial transactions involving the proceeds from unlawful cigarette trafficking. (Am. Compl.Ex. A, 2–3). Interestingly, the Indictment did not charge the defendants with a criminal RICO violation. (To be sure, that fact alone does not negate the possibility that the conspiracy charged also involved an unlawful "enterprise" pursuant to 18 U.S.C. § 1961(4).)

A RICO enterprise "is proved by evidence of an ongoing organization" and by evidence that its members function as a "continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. In describing the alleged enterprise in this case, Plaintiffs state:

> Defendant had entered into a conspiracy with a vertical group that started with the Defendant, the manufacturer of the cigarettes, selling product to large retailers and distributors like, for example, the Price Club and Sam's Club. The large retailer/distributors located in Virginia, like the Price Club or Sam's Club would either sell to a second tier Virginia middleman, like Mars and Roshni ... or would sell directly to the smugglers who traveled down to Virginia from New Jersey or New York. (Am. Compl.¶ 33).[7]

Notwithstanding statements that Philip Morris sold cigarettes to entities who then sold cigarettes to cigarette smugglers, there are insufficient allegations of "an ongoing organization" involving Philip Morris which functioned as a "continuing unit."[8] *See, Schuler v. Board of Edu-*

---

**7.** Mars and Roshni Corporation was a named defendant in the Indictment.

**8.** In describing the alleged "enterprise" in this case, Plaintiff also alleges that "in furtherance and as part of the ... conspiracy, each of the [Indictment] defendants, along with unidentified and unindicted co-conspirators would and did play different roles, take

upon themselves different tasks and participate in the affairs of the conspiracy through various criminal acts. The conspiracy was carried out through the vertical enterprise." (Am.Compl.33). *But see, O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1541 (vague and conclusory allegations not sufficient to support finding of enterprise.)

*cation,* No. 96 Civ. 4702, 2000 WL 134346 at *17 (E.D.N.Y. Feb.1, 2000) (enterprise not sufficiently stated where plaintiffs alleged a "chain conspiracy" to misuse taxpayer dollars and "Plaintiff's complaint [was] devoid of any factual allegations that would support a finding that the defendants, the Commissioner and the CSEA constituted any form of ongoing organization or functioned as a continuing unit."); *Moy v. Terranova,* No. 87 Civ. 1578, 1999 WL 118773 at *5 (E.D.N.Y. March 2, 1999) (enterprise not sufficiently alleged where, other than defendant's ownership interests or affiliations with a number of companies alleged to comprise the enterprise, the complaint "fail[ed] to offer any allegations regarding the continuity or structure of the group or how the entities joined together; indeed, the complaint does not even allege that the group's participants shared a common purpose ... Plaintiffs' conclusory 'naming of a string of entities' does not adequately allege an enterprise ...."); *Schmidt,* 16 F.Supp.2d at 350 (enterprise not sufficiently alleged because the complaint failed "to allege a continuous structure in the enterprise" and "basically restate[d] the allegations against each of the defendants without explaining the interrelationship of these actions or defining coordinated roles played by the enterprises members. There is no allegation of any kind of chain of command or functional integration, as is typical of classic RICO enterprises."); *Cullen v. Paine Webber Group, Inc.,* 689 F.Supp. 269, 273 (S.D.N.Y.1988) (refusing to find that a group of Paine Webber's investment clients were part of a RICO enterprise where "the clients ... did not share a common purpose or associate together; their only link was their broker"); *Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1032 (S.D.N.Y.1987) (dismissing RICO claim where complaint alleged that enterprise members shared common purpose but failed to "specify how these members

joined together as a group to achieve these purposes").

As noted, "[t]he enterprise is not the 'pattern of racketeering'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. In *Schmidt,* a number of investors who had been defrauded by their investment advisor, sued the banks used by the investment advisor, alleging a RICO violation. The banks, among other things, had allowed the investment advisor to have unauthorized access to escrow accounts; approved the investment advisor's overdrafts on over 500 occasions; and failed to notify authorities of the irregularities in the investment advisor's accounts. *Schmidt,* 16 F.Supp.2d at 344. In determining that the plaintiff investors failed to allege an enterprise separate and apart from the racketeering activity, the court noted:

> In assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern or racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation. *Id.* at 349 (citations and quotations omitted).[9]

Here, as in *Schmidt,* there is insufficient allegation of any enterprise involving Defendant Philip Morris. There is no legally discernable and sufficient distinction between the alleged enterprise and the alleged pattern of racketeering activity. The vertical group described by Plaintiff here is merely a reiteration of the (alleged) racketeering activity. Even allowing for the notion that "enterprise" should be defined "broadly," (*United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989)), Plaintiff here has failed to allege a RICO enterprise. *Schmidt,* 16 F.Supp.2d at 350; *Zola v. Gordon,* 685 F.Supp. 354, 373 (S.D.N.Y.1988) (enterprise must have "an

**9.** In concluding that an enterprise was not properly alleged, the *Schmidt* court held that the enterprise "likely would not exist were the

predicate acts removed from the equation." *Id.* at 350 (citations and quotations omitted).

existence beyond that which is merely to commit each of the acts charged as predicate racketeering offenses.") (quoting *United States v. Riccobene*, 709 F.2d 214, 223–24 (3d Cir.1983)).

And, as will be shown, even if Plaintiffs had properly alleged enterprise, they have failed to overcome the additional hurdles of "operation or management" and "causation."

### (b) Operation or Management of the Enterprise

Under § 1962(c), it is unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." *Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). To "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must be said to have played a part in operating or managing those affairs, either by being part of upper management or by exerting control over the enterprise. *Id.* at 184, 113 S.Ct. 1163 (dismissing RICO claim because the defendant's "failure to tell the Co–Op's board that the plant should have been given its fair market value" rather than its fixed asset value, resulting in over-statement of Co–Op's assets and a run in demand notes by investors, was not sufficient to demonstrate operation or management of a RICO enterprise).

Assuming arguendo that Plaintiffs can establish that a cigarette smuggling enterprise existed, Plaintiffs have, nevertheless, failed to allege facts permitting the conclusion that Philip Morris "operated or managed" the affairs of the (smuggling) enterprise within the meaning of 18 U.S.C. § 1962(c). "As interpreted by courts in this district and others, the 'operation and management' test set forth in *Reves* ... is

a very difficult test to satisfy."[10] *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F.Supp. 1071, 1090 (S.D.N.Y. 1996); *see Reves*, 507 U.S. at 183, 113 S.Ct. 1163 ("[O]ne is not liable under [section 1962] unless one has participated in the operation or management of the operation itself."). Courts within the Second Circuit have dismissed RICO claims which failed to meet these stringent standards. *See, e.g., Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2d Cir.1994) (dismissing RICO claim on grounds that provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *Schmidt*, 16 F.Supp.2d at 346 (dismissing RICO claim where plaintiffs allowed the "scheming" party access to certain accounts, approved schemer's overdrafts on 500 separate occasions, misrepresented to investors the status of their accounts, and helped the schemer conceal his scheme generally because these actions only amounted to "assistance to the alleged RICO enterprise" not "direction of it"); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 254 (S.D.N.Y.1997) ("the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself"); *Sundial Int'l Fund v. Delta Consultants, Inc.*, 923 F.Supp. 38, 41 (S.D.N.Y.1996) (dismissing RICO claims against individual bank officers and banks who held investors' deposits in fraud schemes because the banks did not solicit the investments or direct the affairs of the operation); *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 832 F.Supp. 585, 591 (E.D.N.Y.1993) (dismissing RICO claim against attorney whose "role was confined, at all times, to providing legal advice and

---

**10.** The statutory language does not encompass "mere involvement in or assistance to" an illegal enterprise or "aiding and abetting" others in an illegal enterprise. *Reves*, 507 U.S. at 177–79, 113 S.Ct. 1163.

legal services" and noting that "even when professionals go beyond their customary role, they will not be deemed to have participated in 'the operation or management of the enterprise itself.' ").

Amsterdam contends that Philip Morris conducted or operated in the enterprise's affairs in the following manner:

> The Defendant sold such high volumes to large Virginia retailers and distributors, such as Price Club and Sam's Club . . . that the Defendant had to know, and that the Defendant did know, that these contraband cigarettes were being shipped out of Virginia for sale unlawfully within the State of New York. The large retailers and distributors . . . were selling such large quantities to the smugglers who arrived with their vans bearing New York and New Jersey plates that Defendant had to know, and that Defendant did know, that the cigarettes were not being sold for local Virginia area consumption. Defendant, through its wholesale Masters program, and through its agents, whom upon information and belief include, but are not limited to, an individual whose first name is unknown and whose last name is Webster and John Viola, district manager for Virginia, knew of the types of sales committed as described above and encouraged same by selling unlimited amounts of cigarettes to its wholesalers in Virginia and rewarding them for such large sales, with the knowledge that said cigarettes could not and would not be lawfully consumed in Virginia.

(Am.Compl.¶ 163–165). This is not enough to survive a motion to dismiss. "Providing important services to a racketeering enterprise is not the same as directing the affairs of an enterprise." *Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 466 (S.D.N.Y.1996); *LaSalle National Bank*, 951 F.Supp. at 1090 ("[S]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result") (citation

omitted). The provision of goods (here cigarettes) to wholesalers and retailers that were, thereafter, illegally transported from Virginia to New York does not constitute operation or management sufficient to establish a RICO violation. *See Reves*, 507 U.S. at 184, 113 S.Ct. 1163; *LaSalle National Bank*, 951 F.Supp. at 1090. Producing the product that was ultimately smuggled does not equate to operation or management of the smuggling enterprise. *Department of Econ. Dev.*, 924 F.Supp. at 467 ("the provision of services—even essential services—to a RICO enterprise is not the same as controlling the enterprise's affairs"); *Resolution Trust Corp. v. S & K Chevrolet Co.*, 918 F.Supp. 1235, 1246 (C.D.Ill.1996), *vacated in part on other grounds*, 923 F.Supp. 135 (C.D.Ill.1996) (merely supplying goods or services to the enterprise is insufficient under *Reves*); *Arenson v. Whitehall Convalescent & Nursing Home*, 880 F.Supp. 1202, 1209 (N.D.Ill.1995) (supplier-purchaser relationship insufficient to allege that defendant participated in operation or management of enterprise).

The Wholesale and Retail Masters Programs allegedly served to encourage greater sales of Philip Morris' products. This is not an unusual or illegal business practice. It cannot be said that Philip Morris was operating or managing the smuggling enterprise by means of these programs. Indeed, it is even insufficient to state that the defendant has persuasive power to induce the management of the enterprise to take certain actions. *Madanes v. Madanes*, 981 F.Supp. 241, 257 (S.D.N.Y.1997) ("substantial persuasive power to induce management to take certain actions are insufficient to establish Section 1962(c) liability") (citations and quotations omitted); *Morin v. Trupin*, 835 F.Supp. 126, 135 (S.D.N.Y.1993) (holding a defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys "substantial persuasive power to induce the alleged enterprise to take certain actions").

Plaintiff has failed to allege a legally significant connection or nexus between Philip Morris' sales incentives programs and operation or management of the smuggling enterprise.

Amsterdam asserts that Philip Morris was aware of the smuggling of its products from Virginia to New York by virtue of the information it collected through the Retail and Wholesale Masters Program.[11] Amsterdam argues that several retailers in Virginia were knowingly selling cigarettes to smugglers and that some or all of those retailers were part of the Masters Program. Presumably, as a result, those retailers would have been visited by Philip Morris salespeople including, among others, John Viola and Webster. (Am. Compl.¶ 29, 30, 33, 34). Amsterdam also argues that because Philip Morris kept detailed records of its sales in Virginia and New York, it should have known that smuggling was occurring because of the large volume of sales in Virginia. (Am. Compl.¶ 190, 209).

The Court is not required to accept as true "unwarranted deductions" made by the plaintiff, *First Nationwide Bank*, 27 F.3d at 771 (dismissing RICO claim in part because in absence of "a factual basis underlying" the plaintiff's claim that its "losses were not the result of any decline in the real estate market," court "cannot accept

its allegations as facts"), but even if it accepted as true the inference that Philip Morris salespeople were aware of smuggling activity, that would not suffice to support a RICO claim. *Department of Econ. Dev.*, 924 F.Supp. at 468 (dismissing RICO claim because mere knowledge of an enterprise's racketeering activities does not subject one to liability under RICO).[12]

### (c) Causation

RICO provides a civil remedy only to those persons injured "by reason of" a defendant's predicate acts. 18 U.S.C. § 1964(c). This requires a showing not only that the defendant's alleged RICO violation was the "but-for" or cause-in-fact of the plaintiff's injury, but also that the violation was the proximate cause. *First Nationwide Bank*, 27 F.3d at 769 (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). "To show that an injury resulted 'by reason of' the defendant's action ... the plaintiff must allege ... that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Id.* at 769. "[W]hen factors other than the defendant's [action(s)] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." *Id.* The

---

**11.** Plaintiffs included two newspaper articles in their Amended Complaint to support the proposition that Philip Morris was aware of the alleged smuggling enterprise, a matter of "public knowledge." (Am.Compl.¶ 181, 182). The first article from the *New York Daily News*, dated April 26, 1997, reported that "the volume of cigarette smuggling around the world has nearly tripled," and although the tobacco companies "say they do nothing to encourage the smuggling ... recent criminal investigations in several countries show that people in the tobacco industry have played a significant role at times in stimulating and fueling it." (Am.Compl.¶ 181). The second article is a letter to the Editor of the *New York Times* by "a leading New York City citizens rights advocate," dated May 12, 1998, stating that the tobacco companies engage in a "wink-and-nod strategy" with respect to cigarette smuggling. (Am.Compl.¶ 182).

**12.** In *Department of Econ. Dev.*, the Department of Economic Development ("DED"), an agency of the British government, brought a securities fraud action against the accounting firm Arthur Andersen & Co. ("AA") and three of its partners, alleging that DED suffered millions of dollars in damages as a result of the "demise of the DeLorean entities." 924 F.Supp. at 455. DED claimed that AA committed "primary violations" and aided and abetted others in violating the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and RICO, 18 U.S.C. § 1964(a)–(d). Specifically, DED asserted that DeLorean's "Consolidated Financial Statements were false and misleading, and that by issuing reports certifying these statements, AA substantially helped DeLorean and others to execute a securities fraud." *Id.*

Amended Complaint fails to satisfy this requirement and reveals that there were intervening causes for Amsterdam's alleged injuries.[13]

Plaintiffs allege that they lost "in excess of ten million dollars" as a result of the "conspiratorial scheme" carried out by the "vertical group" described by Plaintiff. (Am.Compl.¶ 214). As has been shown, Defendant was neither part of the alleged illegal enterprise nor did it operate or manage the smuggling enterprise. The (direct) cause of Plaintiffs' lost profits was not any activity of Philip Morris'. Rather, the "but for" cause of Plaintiff's alleged loss was, among other things, the smuggling activity and the decision by New York consumers not to purchase cigarettes from Plaintiffs. Moreover, it would be highly speculative to conclude that Plaintiffs lost (any) particular sales of Philip Morris cigarettes to the smugglers. *See Barr Laboratories, Inc. v. Quantum Pharmics Inc.*, 827 F.Supp. 111, 116 (E.D.N.Y.1993) (dismissing RICO claim for lack of proximate cause against seller of unlawfully marketed generic drugs because the court found it equally probable that plaintiff's customers would have purchased a competitor's product, even in the absence of a RICO violation). The decisions of individual purchasers not to buy cigarettes from Amsterdam constituted one independent intervening act between the alleged RICO violations and Amsterdam's alleged injuries. *First Nationwide Bank*, 27 F.3d at 770 (dismissing RICO claim because, when changes in municipal laws, vacancy rates, and a downturn in the real estate market could all constitute "an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of defendant's

actions"); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 485 (D.N.J.1998) (dismissing pharmaceutical company's RICO claim because alleged injuries resulted from "many intervening acts and causes," including decisions by FDA, competitors, retailers, doctors, and consumers); *Sheperd v. American Honda Motor Co.*, 822 F.Supp. 625, 630 (N.D.Cal.1993) (dismissing auto dealership's claims for lost sales allegedly caused by supplier's RICO violation because such lost sales could have resulted from "managerial decisions," .actions of other "competitors," or "local economic trends and consumer demand").

Amsterdam asserts that the "purpose was, and continues to be, to enable Defendant and its vertical group of co-conspirators, to continue to actively and knowingly sell its products in a manner so as to avoid the payment of lawfully imposed New York State and City cigarette taxes...." (Am.Compl.¶ 203). Where, as here, the primary purpose of an alleged racketeering enterprise is to avoid paying taxes or otherwise defraud the government, indirectly injured parties do not have standing to bring RICO claims.[14] *Miller*, 745 F.Supp. at 939 n. 4 (holding that an injury which flows from the defendant's actions aimed at the government in the first instance, and which has only a tertiary effect on the plaintiff, is too remote to support a claim under RICO). In *Miller*, the plaintiff alleged that the defendants formed a RICO enterprise in order to operate "three schemes in violation of 18 U.S.C. § 1962 which purportedly reduced a company's commissions and pre-tax profits as well as the plaintiff's professional status by forcing him to step down as the president of that company." *Id.* at 935. The court dismissed the plaintiff's RICO claim be-

---

**13.** Among the intervening factors causing Plaintiffs' injuries were: the decision/choice by consumers to purchase cigarettes from retailers other than Plaintiffs; the (criminal) smuggling activity by third parties; and New York's high rate of taxation relative to that in other states.

**14.** The standing section of the RICO statute, "section 1964(c), which allows private civil RICO suits to be brought only by '[a]ny person injured in his business or property by reason of a violation of section 1962,' is directly intertwined with the causation element." *Miller v. Helmsley,* 745 F.Supp. 932, 934 (S.D.N.Y.1990).

cause the plaintiff "was not the target of the racketeering scheme ... his lost commissions were the result of 'the scheme to deprive Mr. Helmsley of property through fraudulent transfers.'" *Id.* at 937. In this case, Amsterdam's injuries were secondary to the alleged primary purpose of tax avoidance. (Am.Compl.¶ 203).

The proximate cause determination "is not free from normative legal policy considerations." *First Nationwide Bank,* 27 F.3d at 769 (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990)). The purpose of the smuggling enterprise—to which Defendant was not a party—was to avoid payment of New York taxes, not to injure Plaintiffs or other New York cigarette retailers. Allowing suit by those indirectly injured would open the door to "massive and complex damages litigation [which would] not only burden the courts, but [would] also undermine the effectiveness of treble-damages suits." *Holmes,* 503 U.S. at 274, 112 S.Ct. 1311 (quoting *Associated General Contractors of California, Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

### Anti-Trust Claim

 Plaintiffs claim that Defendant violated § 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson–Patman Act, which provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. 15 U.S.C. § 13(a).

Plaintiffs' theory of price discrimination is that Defendant sold large quantities of cigarettes in Virginia knowing that they would be smuggled to New York, and knowing that the smugglers would undercut the price of legally taxed cigarettes in New York. As a result, Plaintiffs allege that Defendant was providing the smugglers with a lower actual cost than it was offering to the Plaintiffs, who were (properly) paying the New York State excise taxes. (Plaintiffs' Opposition Brief at 19). The disparity in actual costs, according to Plaintiff, amounts to price discrimination. (*Id.*). Philip Morris argues that Amsterdam's allegations do not meet the basic pleading requirements of a Robinson–Patman Act claim. (Defendant's Moving Brief at 18). Specifically, Defendant asserts that Amsterdam has not alleged that Philip Morris charged Plaintiffs a different price than it charged its other customers for cigarettes of like grade and quality. (*Id.* at 19). Defendant is correct.

To state a claim for price discrimination, a plaintiff must allege that the defendant "charged one purchaser a higher price for like goods than he had charged one or more of the purchaser's competitors." *FTC v. Anheuser–Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). "The Robinson–Patman Act does not apply unless the seller has made two actual sales to different purchasers at different prices." *Highspire, Inc. v. UKF America, Inc.,* 469 F.Supp. 1009, 1012 (S.D.N.Y.1979); *Interstate Cigar Co. v. Sterling Drug Inc.,* No. 79 Civ. 3547, 1980 WL 1862, at *1–2 (S.D.N.Y. July 3, 1980). Plaintiffs have not alleged that Defendant made "two actual sales" to different purchasers at different prices for comparable cigarettes.

The term "price," under the Robinson–Patman Act, means "the net price received by the seller from the two buyers in question." *Conoco, Inc. v. Inman Oil Co.,* 774 F.2d 895, 902 (8th Cir.1985).[15] Excise tax-

---

**15.** Plaintiffs erroneously assert that the "price" to be considered under the Robinson–

Patman Act is the "amount actually paid by

es are not an element of "price" under the Robinson–Patman Act because excise taxes are set by and paid to the government, not the seller of the product. *Bryant Corp. v. Outboard Marine Corp.*, No. C93–1365R, 1994 WL 745159, at *5 (W.D.Wash. Sept.29, 1994) (noting that claim of violation of Robinson–Patman Act failed in part because increased sales were caused by a sales tax differential, not by lower prices resulting from price discrimination). New York cigarette wholesalers and retailers may pay a different price per carton of (Philip Morris) cigarettes than those in Virginia, but that differential is a result of the different excise taxes charged by the two states.[16] The tax is paid to the State, not to the wholesaler, *i.e.*, here Philip Morris. Plaintiffs have not alleged that, after discounting the amount of the cigarette taxes, Defendant has charged a lower (different) price for cigarettes in Virginia than in New York. Thus, Plaintiffs have not alleged price discrimination by Philip Morris under the Robinson–Patman Act.

Plaintiffs also allege that their payment of higher excise taxes to persons (entities) other than Defendant constitutes "indirect" price discrimination. (Am. Compl.¶ 229). This does not save the day. It is well established that the forms of "indirect" price discrimination encompassed by the Robinson–Patman Act are limited to rebates, discounts, free goods, promotional payments, or similar forms of compensation that are given by the seller to the buyer and that, effectively, lower the price charged by the seller to the buyer (in comparison to other buyers). *Conoco*, 774 F.2d at 901–02; *Black Gold Ltd. v. Rockwool Ind.*, 729 F.2d 676, 682 (10th Cir.1984) (indirect price discrimination only arises when "discriminations in the terms of sale [operate] to permit the favored customers to purchase at a lower price than other customers, so that their

only practical effect [is] to establish discriminations in price.") (citation omitted). Plaintiffs cannot claim "indirect" price discrimination because they have not alleged that "forms of compensation ... are [being] given by the seller to the buyer ... that effectively lower the price charged by the seller to the buyer." *Conoco, Inc.*, 774 F.2d at 901–02.

### III. State Law Claims

■ In *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the United States Supreme Court emphasized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. 1130. Under *Gibbs*, a Federal court must consider factors of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case involving pendent state law claims. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.*; *see also Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir.1994) (holding that after summary judgment dismissal of federal claims, "[i]t would be an inappropriate exercise of pendent jurisdiction and a waste of federal judicial resources for the District Court to hold a trial on a purely state claim"); *DiLaura v. Power Authority*, 982 F.2d 73, 80 (2d Cir.1992) (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.")); 28 U.S.C. § 1367(c)(3) (codify-

the purchaser." (Plaintiff's Opposition Brief at 18).

**16.** Plaintiffs indicate that New York State and City sales tax are approximately $7.90 per

carton, as compared to Virginia's tax of $.25 per carton. (Plaintiffs' Opposition Brief at 19, n. 3).

ing existing case law and giving District courts discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction"). Here, because no Federal claims remain, Plaintiff's state law claims are dismissed.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss [24–1] is granted. The Clerk is respectfully requested to enter judgment dismissing the complaint.